UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENRY CALVERT,

                     Plaintiff,              Civil Action No. 12-15173
                                              Honorable David M. Lawson
                                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                     Defendant.
_____/

### REPORT AND RECOMMENDATION
### ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]

Plaintiff Henry Calvert ("Calvert") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 10], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**      **RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Calvert is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Calvert's Motion for Summary Judgment [9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On December 11, 2009, Calvert filed an application for SSI, alleging a disability onset date of January 1, 2008.[1]  (Tr. 96-100).  This application was denied initially on June 24, 2010.  (Tr. 56-59).  Calvert filed a timely request for an administrative hearing, which was held on May 9, 2011, before ALJ Kathleen Eiler.  (Tr. 37-53).  Calvert, who was represented by attorney Mikel Lupisella, testified at the hearing, as did vocational expert Dr. Donald Hecker.  (*Id.*).  On June 24, 2011, the ALJ issued a written decision finding that Calvert is not disabled.  (Tr. 18-25).  On October 1, 2012, the Appeals Council denied review.  (Tr. 1-4).  Calvert filed for judicial review of the final decision on November 26, 2012.  (Doc. #1).

### B.    Background

#### 1.    *Disability Reports*

In an undated disability report, Calvert indicated that his ability to work is limited by cervical pain (in his neck and shoulder).  (Tr. 125).  Calvert stopped working on June 1, 2006, because he lost his job and could not find another one; however, by his own admission, he was capable of working until January 4, 2010.  (Tr. 112, 126).  Calvert completed high school but had no further education or training.  (*Id.*).  When asked in the disability report about his work history, Calvert did not list any jobs that he had held in the preceding fifteen years.[2]  (Tr. 127).  Calvert reported that he had had MRI/CT scans of his neck, shoulders, and low back in November of 2009.  (Tr. 130).  At the time of the report, he was taking naproxen and Vicodin (for pain) and Valium (to help him sleep).  (Tr. 128).

---

[1] Calvert later amended his application to reflect an alleged onset date of January 4, 2010.  (Tr. 112).

[2] Calvert did complete a work history report on February 2, 2010, in which he indicated he had worked as a housekeeper, a spray painter, and in various other "odd jobs."  (Tr. 157-64).

In a function report dated January 24, 2010, Calvert reported that he lives in a house with his family. (Tr. 149). When asked to describe his daily activities, Calvert indicated that he helps get his children ready for school, takes his medication, prepares lunch, watches television, and attends physical therapy appointments. (*Id.*). When asked to describe what he could do before the onset of his condition that he can no longer do, Calvert listed go to the gym, play with and lift his children, and "find work." (Tr. 150). His condition affects his sleep because he has difficulty getting comfortable. (*Id.*). He has trouble putting on his shirt, jacket, and shoes; he cannot wash his own back; he cannot cut his own hair; and he cannot shave. (*Id.*). He does not do yard work because it is too painful. (Tr. 152). However, he prepares sandwiches and multi-course meals on a daily basis and is able to make his bed and prepare a bath. (Tr. 151). He goes outside every day and is able to ride in a car and use public transportation, but he does not drive. (*Id.*). He goes shopping for food and clothes once or twice a month. (*Id.*). His hobbies include watching television, playing dominoes, and playing cards. (Tr. 153).

When asked to identify functions impacted by his condition, Calvert checked lifting, squatting, standing, reaching, walking, sitting, stair climbing, memory, and completing tasks. (Tr. 154). He indicated that he can lift 15-20 pounds and walk about one mile before he has to rest. (*Id.*). Calvert indicated that he uses a neck brace and "pillow," which were prescribed in December of 2009, on a daily basis. (Tr. 155).[3]

In a third party function report dated January 24, 2010, Calvert's wife, Samantha, indicated that he is unable to "sit/stand for long period [sic] of time" or "lift 20 lbs." without having "major pain" in his neck, shoulders, and back. (Tr. 141). Ms. Calvert indicated that, on a

---

[3] On May 18, 2010, Calvert completed another function report, in which he indicated that he was more limited in some respects (for example, he could no longer cook, do any housework, or go shopping). (Tr. 167-68). However, he indicated that he still went outside on a daily basis and could still lift 20 pounds. (Tr. 168, 170).

daily basis, Calvert gets their children ready for school, rides with her to drop them off and pick them up at school, goes to physical therapy, watches television, takes out the trash, and cooks dinner. (Tr. 141-42). However, Ms. Calvert indicated that Calvert can no longer play basketball, paint houses, go bowling, or play with his children. (Tr. 142). He has trouble sleeping, tossing and turning and complaining about back pain. (*Id.*). Ms. Calvert indicated that Calvert is able to prepare "complete meals" and make the bed on a daily basis, but he does not do yard work. (Tr. 143-44). He is unable to drive because he wears a neck brace and, therefore, cannot turn his neck very far.[4] (Tr. 144). Ms. Calvert reported that her husband spends time with others: he plays dominoes with friends, visits his mother's house, and attends physical therapy appointments. (Tr. 145). She indicated that he has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, stair climbing, and with memory and completing tasks. (Tr. 146). She further indicated that he can lift 20 pounds and walk for 35 minutes at a time. (*Id.*).

In a disability appeals report dated August 28, 2010, Calvert reported that his condition had worsened since his last report. (Tr. 175). Specifically, Calvert indicated that, beginning on approximately March 8, 2010, he had been experiencing constant neck, shoulder, and back pain; was unable to turn his neck or lift his arms above his head without pain; and was unable to lift without pain. (*Id.*). He also had begun experiencing muscle spasms. (*Id.*). Since the time of his last report, he had had surgery on his neck and had begun physical therapy. (Tr. 177).

### 2.    *Calvert's Testimony*

At the May 9, 2011 hearing before the ALJ, Calvert testified that he cannot work because he "can't lift anything heavy." (Tr. 41). Specifically, Calvert testified that he had neck surgery in March of 2010 and, since that time, has still been experiencing neck and back pain. (*Id.*). He

---

[4] Interestingly, Calvert indicated that he does not drive because he does not have a valid driver's license. (Tr. 168).

4

says his neck, shoulders, and back are "sore 50 to 75 percent of the day," and he spends most of

his time either sitting in a recliner with his feet up or lying in bed watching television. (Tr. 41,

45, 47). He has been to physical therapy "a couple of times," but that has not provided any

relief. (Tr. 41-42).

Calvert testified that he can bathe and dress himself, but he cannot do any household

chores. (Tr. 44). He is able to drive "[t]o a certain point." (*Id.*). He cares for his six-month old

daughter (changing her diapers, getting up with her during the night), but he cannot hold her for

long periods of time. (Tr. 46). He has difficulty sleeping for more than two or three hours at a

time because of pain. (*Id.*). Calvert testified that his doctor told him not to lift anything over 20

pounds and to climb stairs as little as possible. (*Id.*). He said that he is able to sit for only 20-25

minutes at a time, and he cannot walk even one block. (Tr. 45).

### 3.   *Medical Evidence*

#### a.   *Treating Sources*

Between September and December of 2009, Calvert sought treatment from his primary

care physician, Dr. Morse, for shoulder and neck pain with occasional finger numbness. (Tr.

260-64). On September 21, 2009, Calvert had x-rays of his thoracic spine (which were normal),

shoulders (which were also normal), and cervical spine (which showed modest degenerative

spondylosis at C5-C6 and bony spur encroachment upon the neural foramina at C4-C5 and C6-

C7). (Tr. 269). An October 19, 2009 MRI of Calvert's thoracic spine demonstrated no

significant abnormality.[5] (Tr. 265). Dr. Morse prescribed Vicodin and subsequently referred

---

[5] The record also contains an October 20, 2009 "Discharge/Instruction Sheet" indicating that the discharged patient could gradually return to work over a two-week period, with no contact sports. (Tr. 266). Although the ALJ discussed this document in her decision (Tr. 22), and the Commissioner addressed it in her brief (Doc. #10 at 13), it clearly indicates – in the top, right-hand corner – that it pertains to a different patient (one who, unlike Calvert, was fourteen years old). (Tr. 266). Thus, this document is completely irrelevant to Calvert's claims.

Calvert to a neurosurgeon.  (Tr. 261-62).

On December 17, 2009, Calvert first saw Dr. Salibi, a neurosurgeon, complaining of neck and shoulder pain with finger numbness.  (Tr. 341-43).  Specifically, Calvert reported posterior neck pain radiating down the mid-thoracic spine area, down to both shoulders and the right upper extremity, with numbness and tingling in one of the fingers on his right hand.  (Tr. 341).  On examination, Calvert's cervical range of motion was severely restricted in all directions, he had normal sensation and upper extremity strength, and deep tendon reflexes were absent at his knees, ankles, biceps, and triceps.  (Tr. 342-43).  Dr. Salibi noted that a cervical MRI, performed on November 5, 2009, showed left-sided C3-C4 disc/osteophyte complex producing left foraminal stenosis; a disc bulge at C4-C5 with mild right foraminal stenosis; and a disc bulge at C5-C6 without significant stenosis.  (Tr. 343).  Dr. Salibi recommended physical therapy, advised Calvert to continue taking pain medication and muscle relaxants, and suggested that Calvert use a soft cervical collar during the day and a high-density foam cervical pillow at night.  (*Id.*).  Dr. Salibi also ordered electrodiagnostic testing of Calvert's right upper extremity.  (*Id.*).

On February 5, 2010, Calvert returned to see Dr. Salibi, reporting that he had attended several physical therapy sessions, which provided "minimal relief."  (Tr. 299-300).  Calvert also indicated that he had begun experiencing some low back pain, which started during physical therapy.  (Tr. 299).  On examination, he had full strength in his upper extremities, but he did have dilated lateral trapezius tightness and absent biceps and triceps deep tendon reflexes.  (*Id.*).  Dr. Salibi noted that Calvert had not undergone electrodiagnostic testing "due to a scheduling error" and asked that he return after that testing was completed.  (*Id.*).

Electrodiagnostic testing performed on February 11, 2010, resulted in findings consistent with C6 right radiculopathy.  (Tr. 283).  On February 18, 2010, Calvert again saw Dr. Salibi to

discuss his treatment options, which included continued conservative management or surgery. (Tr. 234-37).   On March 8, 2010, Dr. Salibi performed cervical decompression surgery and fusion at the affected cervical spine levels.   (Tr. 240-42).   A cervical spine CT scan performed the next day showed that Calvert had a metallic plate buttressing a fusion from C3 to C6 in good alignment, and mild cervical spondylosis with mild multilevel disc space narrowing but no evidence of spinal stenosis.  (Tr. 238).

On April 22, 2010, Calvert returned to Dr. Salibi's office for a post-operative visit, complaining of mild neck and right shoulder pain.  (Tr. 232-33).  He had full upper extremity strength, and the physician's assistant who examined him noted that he had been wearing a hard cervical collar for six weeks and was likely getting some associated muscle spasm from that. (Tr. 232).  Calvert was prescribed Vicodin and advised to switch from a hard to a soft cervical collar.[6]  (*Id.*).  A cervical spine x-ray performed on May 26, 2010, showed fusion at C3, C4, C5, and C6, with satisfactory alignment and post-operative appearance.  (Tr. 218).

On July 1, 2010, Calvert presented to Dr. Salibi with complaints of posterior neck pain, which radiated down into the bilateral trapezius area and occasionally to the back of the head. (Tr. 372).  He denied any upper extremity radiculopathy but said that he had significant muscle spasms when he removed his soft cervical collar.  (*Id.*).  Calvert had normal upper extremity strength, but some tenderness to palpation of his posterior neck musculature.  (*Id.*).  Dr. Salibi indicated that Calvert appeared to be having muscle spasms associated with his surgery and stated that he would benefit from gradually weaning off the soft cervical collar and participating in physical therapy.  (*Id.*).

On September 21, 2010, Calvert presented to Dr. Morse with complaints that included

---

[6] Calvert also saw Dr. Morse on April 2, 2010, and May 2, 2010, complaining of cervical pain on each occasion and obtaining prescriptions for Vicodin.  (Tr. 222-23).

neck and right side pain.  (Tr. 357).  He displayed a "guarded cervical posture," but had normal neck and head alignment and mobility.  (Tr. 359).  Dr. Morse prescribed medications for pain and muscle spasms.  (*Id.*).

Two days later, Calvert saw Dr. Salibi with complaints of continued posterior neck pain radiating to his shoulders and elbows.  (Tr. 370).  Calvert indicated that he had attended four physical therapy sessions, but he felt that physical therapy exacerbated his pain, so he did not complete the prescribed program.  (*Id.*).  Dr. Salibi noted that a CT of Calvert's cervical spine performed on September 15, 2010 showed that his metal plate from C3 to C6 and his implant at C5-C6 were stable, and there was no disc herniation.  (*Id.*).  Dr. Salibi ordered an MRI of Calvert's cervical spine and refilled his pain medication.  (Tr. 371).

On October 12, 2010, Calvert returned to see Dr. Morse, complaining that he had a cough that increased the pain in his shoulders.  (Tr. 353).  On examination, Calvert had normal head and neck alignment, with a slightly guarded posture and limited mobility (status post-surgery). (Tr. 354).  Dr. Morse noted that Calvert's gait and station were normal and he was able to undergo exercise testing and/or participate in an exercise program.  (*Id.*).

On November 11, 2010, Calvert again presented to Dr. Morse with complaints of constant bilateral neck pain radiating to his shoulders and associated weakness in his hands.  (Tr. 349).  He reported having difficulty with his activities of daily living, saying he was unable to hold his newborn to feed her because he could not tolerate flexion or rotation.  (*Id.*).  Upon examination, Calvert had guarded posture in his "upper quarter/cervical," "4+/5-" grip strength, and 1+ reflexes in the bilateral brachioradialis (a muscle in the forearm).  (Tr. 349-50).  Dr. Morse again prescribed medications for pain and for muscle spasms.  (Tr. 350).

On November 30, 2010, Calvert returned to Dr. Salibi, continuing to report posterior

neck pain radiating to the top of both shoulders. (Tr. 368). He also indicated that he had chronic low back pain, which had recently worsened. (*Id.*). Dr. Salibi noted that a September 2010 cervical spine MRI showed C3-C4 left-sided foraminal stenosis. (*Id.*). However, Dr. Salibi stated that Calvert's fusion appeared stable and his C3-C4 foraminal stenosis would most likely re-mold as the fusion continued to progress. (Tr. 369).

On December 28, 2010, Calvert returned to Dr. Morse for conditions unrelated to his back and neck pain. (Tr. 345-46). At that visit, Dr. Morse explained to Calvert that he would no longer prescribe narcotic pain medication because the Michigan Automated Prescription System ("MAPS")[7] indicated that he was obtaining medications from multiple providers and pharmacies and getting early refills. (Tr. 346). There is no indication in the record that Calvert returned to Dr. Morse after this visit.

On March 8, 2011, Calvert presented to Dr. Salibi with complaints of occasional right-sided neck pain (with turning to the left) and occasional posterior neck pain with radiation to the top of both shoulders (worse on the right than the left). (Tr. 366). He also reported low back pain that radiated across the waist, which increased with climbing stairs. (*Id.*). On examination, Calvert had bilateral hamstring tightness, but no other abnormalities. (*Id.*). Dr. Salibi managed Calvert's medications, recommended cervical and lumbar spine physical therapy, and ordered a lumbar spine MRI and CT scan. (Tr. 367).

Calvert next saw Dr. Salibi on April 14, 2011, with complaints of an occasional posterior neck ache that radiated to the top of both shoulders; intermittent right hand numbness and

---

[7] According to the Michigan Department of Licensing and Regulatory Affairs, MAPS is the prescription monitoring program for the State of Michigan. This system enables practitioners to determine if patients are receiving controlled substances from other providers and assists in the prevention of prescription drug abuse. *See* http://www.michigan.gov/lara/0,4601,7-154-35299_63294_63303_55478---,00.html (last checked August 27, 2013).

tingling; midline low back pain, which radiated upward but did not travel around to the waist or into the buttocks; and right thigh pain down to the knee. (Tr. 364). Dr. Salibi noted no abnormalities on examination and stated that the lumbar spine MRI performed earlier that month showed degenerative disc disease at L5-S1, represented by a mild-to-moderate midline disc bulge. (Tr. 364-65). Dr. Salibri again recommended physical therapy for Calvert's lumbar and cervical spines. (Tr. 365).

### b.     Consultative Sources

On June 23, 2010, a physical residual functional capacity ("RFC") assessment was conducted. (Tr. 209-16). Robert Nelson, M.D., a state agency medical consultant, examined Calvert's medical records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour workday, and push or pull without limitation. (Tr. 210). Dr. Nelson further concluded that Calvert could occasionally crawl and climb ladders, ropes, and scaffolds, and that he was not limited in climbing ramps or stairs, stooping, balancing, kneeling, or crouching. (Tr. 212). In addition, Dr. Nelson concluded that Calvert should engage in only occasional overhead reaching with both arms. (Tr. 213).

### 4.     Vocational Expert's Testimony

Dr. Donald Hecker testified as an independent vocational expert ("VE"). (Tr. 49-52). The VE characterized Calvert's past work as a general laborer as unskilled in nature and medium in exertion. (Tr. 49-50). Similarly, he characterized Calvert's past jobs as a sales attendant and as a cleaner as unskilled light work. (*Id.*).

The ALJ asked the VE to imagine a claimant of Calvert's age, education, and work experience, who could perform sedentary, unskilled work, but with only occasional climbing,

crawling, balancing, stooping, crouching, kneeling, and overhead reaching with both arms.  (Tr.

50-51).  The VE testified that the hypothetical individual would be capable of working as a

packer (approximately 4,500 jobs in the state of Michigan), a checker/inspector (4,500 jobs), and

as a clerical employee (7,000 jobs).  (Tr. 51).

### C.    Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Calvert is not disabled under the Act. At Step One, the ALJ found that Calvert has not engaged in substantial gainful activity since December 11, 2009, the application date. (Tr. 20). At Step Two, the ALJ found that Calvert has the severe impairments of degenerative disc disease of the cervical and lumbar spine regions, and status post-cervical diskectomy. (*Id.*). At Step Three, the ALJ found that Calvert's impairments do not meet or medically equal a listed impairment. (Tr. 20-21).

The ALJ then assessed Calvert's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work, except that he can only occasionally climb, crawl, balance, stoop, crouch, and kneel, and he can only occasionally reach overhead with his bilateral upper extremities. (Tr. 21-23).

At Step Four, the ALJ determined that Calvert is unable to perform his past relevant work. (Tr. 24). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Calvert is capable of performing a significant number of jobs that exist in the national economy. (Tr. 24-25). As a result, the ALJ concluded that Calvert is not disabled under the Act. (Tr. 25).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

13

evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."   *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

    **F.**    **Analysis**

    *1.*    *The ALJ's RFC Assessment is Supported by Substantial Evidence*

After considering the medical evidence, Calvert's testimony, and the statements he made in disability reports, the ALJ determined that Calvert retains the RFC to perform a reduced range of sedentary work.  (Tr. 21-23).  In reaching this conclusion, the ALJ gave some weight to the opinion of Dr. Nelson, the state agency medical consultant, who reviewed Calvert's medical records.  (Tr. 22).  However, the ALJ reduced Calvert from light work, as found by Dr. Nelson, to sedentary work due to recent MRI results showing degenerative disc disease in the lumbar spine, as well as Calvert's continuing subjective reports of pain.  (*Id.*).  The ALJ considered Calvert's allegations of extreme limitations, but, as discussed below, appropriately discounted them because they conflicted with the medical evidence, his reported activities of daily living, and his work history.  (Tr. 22-23).  These were appropriate considerations.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (an ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record).  Thus, the ALJ's RFC finding is well-reasoned and supported by substantial evidence.

    *2.*    *Calvert's Arguments are Without Merit*

In his motion for summary judgment, Calvert makes several arguments, all of which are without merit.  First, Calvert includes in his motion a large amount of boilerplate language regarding how an ALJ should evaluate and weigh treating source opinions.  (Doc. #9 at 13-15).

14

However, Calvert specifies neither the identity of the treating source to which he refers nor any particular "opinion" that person rendered which the ALJ allegedly failed to consider.  And, indeed, the record does not contain any treating medical source opinions.[8]  Thus, any argument by Calvert that the ALJ failed to give controlling weight to a treating source opinion, or to give good reasons for the weight given such an opinion, is wholly without merit.

Similarly, Calvert vaguely asserts (in a heading in his motion) that the ALJ failed to "properly evaluate all the medical records," but he does not identify any specific medical records that the ALJ allegedly overlooked or improperly evaluated.  *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.") (internal quotations omitted).  Thus, this argument too fails.  At any rate, as discussed below, the ALJ did appropriately evaluate the medical evidence.

Next, Calvert argues that the ALJ erred in finding his subjective complaints to be less than fully credible.  (Doc. #9 at 10-12, 15-16).  Specifically, Calvert asserts that the ALJ should have found his complaints credible because they were supported by objective medical evidence, and because his ability to perform childcare and other activities does not show that he could undertake a reduced range of sedentary work.  (*Id.*).  Neither of these arguments is persuasive.

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health &*

---

[8] As discussed in footnote 5, *supra*, the October 2009 "Discharge/Instruction Sheet" signed by Dr. Khalil (Tr. 266) and evaluated by the ALJ in her decision (Tr. 22) does not pertain to Calvert and, thus, is not a relevant treating source opinion.

*Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. &*

*Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be

disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  And,

when a complaint of pain is in issue, after the ALJ finds a medical condition that could

reasonably be expected to produce the claimant's alleged symptoms, she must consider "the

entire case record, including the objective medical evidence, the individual's own statements

about symptoms, statements and other information provided by treating or examining physicians

… and any other relevant evidence in the case record" to determine if the claimant's claims

regarding the level of his pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *2 (July 2,

1996); *see also* 20 C.F.R. § 404.1529.

     In this case, the ALJ specifically considered the objective medical evidence regarding

Calvert's cervical and lumbar spine conditions and determined that it was inconsistent with his

alleged limitations.  (Tr. 22).  The ALJ found that Calvert had cervical degenerative disc disease,

which was treated with successful cervical fusion surgery in March of 2010.  (Tr. 22).  The

medical evidence supports this conclusion.  In December of 2009, Dr. Salibi noted that a cervical

spine MRI showed left-sided C3-C4 disc/osteophyte complex producing left foraminal stenosis;

a disc bulge at C4-C5 with mild right foraminal stenosis; and a disc bulge at C5-C6 without

significant stenosis.  (Tr. 343).  However, a cervical spine x-ray performed in May of 2010 (after

Calvert's fusion surgery) showed fusion at C3-C6, with satisfactory alignment and post-operative

appearance.  (Tr. 232).  Moreover, in September of 2010, Dr. Salibi noted that a recent cervical

spine CT showed that Calvert's metal plate from C3 to C6 and his implant at C5-C6 were stable,

and there was no disc herniation.  (Tr. 370).  Although Calvert points to the September 28, 2010

cervical spine MRI, which showed some foraminal stenosis (Doc. #9 at 11), he fails to mention

Dr. Salibi's notation that this stenosis would "most likely re-mold as the fusion continues to progress." (Tr. 369). In addition, in discounting Calvert's claims of disabling spine limitations, the ALJ noted that after the successful spinal surgery, Dr. Salibi embarked upon a conservative treatment program, which primarily consisted of recommending the use of a soft cervical collar and physical therapy. (Tr. 22). Thus, the ALJ's conclusion that Calvert suffered from degenerative disc disease of the cervical spine, but that his fusion surgery was successful, is supported by substantial evidence.

The ALJ also found that Calvert's reported daily activities conflicted with his allegedly disabling limitations. (Tr. 23). Specifically, the ALJ noted that Calvert "acknowledged being capable of performing a wide-array of activities of daily living." (Id.). Indeed, the evidence establishes that Calvert helped his children get ready for school, prepared meals, and shopped for food and clothes. (Tr. 149-52). And, although Calvert initially claimed that he was unable to care for his infant daughter, he later admitted that he got up with her during the night and changed her diapers. (Tr. 46). The ALJ noted that caring for an infant is "demanding both physically and emotionally …." (Tr. 23).

In his motion, Calvert argues that the fact that he took care of his infant child does not mean that he was capable of performing full-time work.[9] (Doc. #9 at 12). As the Commissioner correctly points out, however, the ALJ did not find that Calvert could work because he was able to care for his child. Rather, the ALJ found that Calvert's ability to care for his child – a task

---

[9] Calvert also argues that, contrary to the ALJ's finding, he had serious difficulty caring for his infant child, as evidenced by a statement he made to Dr. Morse in November of 2010 (when he indicated he was unable to hold his newborn to feed her because he could not tolerate flexion or rotation of his neck). (Doc. #9 at 12 (citing Tr. 349)). However, this single piece of evidence – which is simply a subjective statement made by Calvert himself – does not undercut the ALJ's finding that he was capable of caring for his infant child. This is particularly true given Calvert's statements that he helped get his other children ready for school, fed them, changed his infant daughter's diapers, and got up with her in the night. (Tr. 46, 149-50).

that the ALJ found to be physically demanding – conflicted with his allegations of extreme physical limitations, thus negatively affecting his credibility. (Tr. 23). Calvert has not identified any error in this respect.

The ALJ also examined Calvert's work history when evaluating his credibility. (Tr. 23). This was a proper consideration. *See Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *5 (July 2, 1996) (credibility assessment must be based on a consideration of all of the evidence, including the claimant's prior work record and efforts to work). The ALJ noted that Calvert had a "sporadic work history," which undercut his allegations that he was unable to work because of a medical disability. (Tr. 23). An examination of Calvert's earnings report shows that the ALJ's characterization was generous: during the fifteen-year period preceding his alleged onset date, Calvert had no earnings during nine of those years. (Tr. 110). The ALJ also noted that Calvert stopped working for reasons unrelated to any medical disability. (Tr. 23). This finding, too, is borne out by the record evidence: Calvert reported that he stopped working in June of 2006 (more than three years before his alleged onset date) not due to a physical inability to do so, but because he lost his job and could not find another one. (Tr. 126).

For all of the reasons set forth above, Calvert has failed to identify any error in the ALJ's credibility determination, and substantial evidence supports her determination that Calvert had the RFC to perform a reduced range of sedentary work.

2. *The ALJ Reasonably Relied on The Vocational Expert's Testimony*

Calvert also argues that the ALJ's hypothetical questions to the VE were insufficient because they did not account for all of his credible limitations. (Doc. #9 at 8-10, 12-13). An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has workplace restrictions. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). In order for a vocational expert's testimony in response to a

18

hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

To the extent that Calvert argues that his functional limitations were greater than those found by the ALJ, the Court has already addressed that claim above, finding that the ALJ's determination of Calvert's RFC was appropriate and supported by substantial evidence.  The ALJ also posed a complete hypothetical question to the VE and reasonably accepted the VE's testimony that the hypothetical individual described could perform work which exists in significant numbers in the national economy.  This testimony provides substantial evidence to support the ALJ's finding that Calvert is not disabled.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

Because the hypothetical questions the ALJ posed to the VE included all of Calvert's credible limitations, the VE's testimony was sufficient and the ALJ was entitled to rely upon it. Therefore, substantial evidence supports the ALJ's determination that Calvert is not disabled.

### III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Calvert's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: August 30, 2013                          s/David R. Grand
Ann Arbor, Michigan                             DAVID R. GRAND
                                                United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 30, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

20